#31166-a-MES
**2026 S.D. 46**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

THE PEOPLE OF THE STATE OF SOUTH DAKOTA
IN THE INTEREST OF A.L. and D.L., Minor Children
and concerning N.W. and E.L., Respondents,
Lower Brule Sioux Tribe, Intervenor.

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

THE HONORABLE ROBIN HOUWMAN
Judge

MATTHEW MIRABELLA of
South Dakota Office of Indigent
   Legal Services
Sioux Falls, South Dakota

Attorneys for appellant N.W.


MARTY JACKLEY
Attorney General

COURT ROPER
Special Assistant Attorney General
Pierre, South Dakota

Attorneys for appellee State of
South Dakota.

CONSIDERED ON BRIEFS
MAY 28, 2026
OPINION FILED **07/15/26**

#31166

SALTER, Justice

[¶1.] This appeal follows the circuit court's decision to terminate Mother's parental rights. Mother was incarcerated in federal prison from the beginning of the case through its final disposition. She does not allege any error in the court's actual decision to terminate her rights. Rather, she argues that the court abused its discretion by denying her continuance requests based upon the pendency of a motion for compassionate release from federal custody. We affirm.

**Factual and Procedural History**

[¶2.] Unfortunately, Mother has a history of drug abuse and dealing drugs. She also has a history of intervention by the Department of Social Services (the Department) due to allegations she placed her children in high-risk situations or harmed them. For instance, in 2007, the Department substantiated a claim of abuse and neglect after concluding that Mother was participating in drug trafficking with her children present. The conduct led to an abuse and neglect petition and placement for the children who were not the same two children at issue in this case. Around the same time, Mother pled guilty in federal court for what a United States Probation Office memorandum referred to as "maintaining a drug-related premises." *See* 21 U.S.C. § 856 (describing the offense of maintaining a drug-involved premises). She was sentenced in 2007.

[¶3.] And in 2011, the Department again substantiated abuse and neglect allegations, this time involving D.L. and A.L., the children at issue in this appeal (the Children). The Children, who were both very young—D.L. was born in 2010, and A.L. was born in 2011—both sustained injuries to their faces. The Department

-1-

was unable to establish Mother was directly responsible, but it could not rule Mother out as the perpetrator. A court ultimately denied an abuse and neglect petition.

[¶4.]    In August 2017, Sioux Falls police officers conducted a traffic stop of a vehicle driven by Mother who was accompanied by three of her children, including D.L. and A.L. The officers seized from Mother's pockets separate jeweler's bags of methamphetamine along with oxycodone and hydrocodone pills. They arrested Mother and contacted an on-call Department representative who arrived and ensured that all three children could be placed with their maternal grandmother who was also in the vehicle.

[¶5.]    Although it is not completely clear in our record, it appears that the August 2017 traffic stop led to a larger investigation and eventually to Mother's federal indictment for conspiracy to possess and distribute controlled substances. She pled guilty in December 2018, and a federal district court imposed a mandatory minimum prison sentence of 180 months in March 2019 with an anticipated release date of January 4, 2030.[1]

[¶6.]    After Mother's 2019 sentencing, the Children eventually ended up in the care of their father (Father) and his girlfriend. In February 2024, A.L. disclosed an incident of domestic violence between Father and his girlfriend to a school guidance counselor. Upon further inquiry, the school guidance counselor learned

---

1.    It appears that Mother's mandatory minimum sentence was imposed pursuant to 21 U.S.C. § 841(b), which prescribes a "term of imprisonment of not less than 15 years" for individuals who are convicted "after a prior conviction for a serious drug felony."

that Father would often hit A.L. and D.L. while wearing boxing gloves, and the Children were scared to live in the home.

[¶7.]     Shortly after A.L.'s report, law enforcement officers responded to the home after D.L. threatened to kill himself. Officers learned from Father's girlfriend that his current whereabouts were unknown. According to his girlfriend, Father came and went as he pleased, leaving her to care for the Children. Officers placed A.L. and D.L. in the Department's custody.

[¶8.]     On February 23, 2024, the State petitioned for a temporary custody order. At a hearing held the same day, Mother appeared via video conference from a federal prison in Minnesota. Father did not appear. Mother did not contest the temporary custody petition, and the circuit court granted the request. Subsequently, on March 8, the State filed a petition alleging abuse and/or neglect under SDCL 26-7A or 26-8A.[2] Both parents eventually stipulated that the Children lacked proper parental care under SDCL 26-8A-2(2).

[¶9.]     Throughout the circuit court proceedings, Mother engaged with the Department and the court to the limited extent that she could while in custody. She communicated with the Department, attended hearings by video conference, and participated in phone calls with the Children. Father, on the other hand, did not engage in any efforts to reunify with the Children. He shifted blame to the

---

2. Although it is not significant to our analysis of the issue Mother identifies in this appeal, the State's petition also noted the Children's Indian status and the applicability of the Indian Child Welfare Act. The record indicates the State provided notice of the case to the Lower Brule Sioux Tribe.

Children and was opposed to working with the Department. Though Father had counsel, Father did not attend the dispositional hearing.[3]

[¶10.] Unsworn updates from the attorneys provided periodically during the pendency of the case revealed that both D.L. and A.L. have significant needs related to behavioral issues and their mental health. The Children were not placed together; each was placed in different foster care and institutional settings that changed during the fifteen-months the case was pending. At the time of the final dispositional hearing, D.L.'s condition had improved, and he was living with his twenty-year-old half-brother who was providing sound care. A.L. was completing an inpatient stay at a facility in Arkansas.

[¶11.] The focus of Mother's appeal here is her effort to obtain compassionate release from her custodial sentence pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), which permits release in certain circumstances for "extraordinary and compelling reasons." Mother made three separate requests to the federal district court that sentenced her. The district court denied Mother's first and second pro se motions in March 2024 and December 2024. The third was filed with the assistance of counsel. Although the copy included in the record is undated, the circuit court noted it had been filed in October 2024 and remained pending at the time of the May 7, 2025, final dispositional hearing.

[¶12.] The third compassionate release motion was oriented toward A.L., who, Mother stated, was unlike D.L. in the sense that A.L. was "in foster care and

---

3.    The circuit court also terminated Father's parental rights; he has not appealed.

has no other available caregivers." Significantly, the motion conveyed some degree of urgency and asked the federal district court to act before the impending dispositional hearing for fear that Mother's parental rights would be terminated:

> The family court has set trial dates for [the] termination of [Mother's] parental rights over [A.L.] on May 7 and 8, 2025. . . . Termination proceedings were triggered by state statute because [A.L.] has been in state custody for one year, and due to [Mother's] incarceration, there is "little likelihood that the . . . child can be returned to the custody of the child's parents." [quoting SDCL 26-8A-26] . . . . Thus, while [Mother] maintains full parental rights to [A.L.], [*the Department*] *acknowledged that these rights will likely be terminated unless this Court grants* [*Mother's*] *early release. . . .* However, she could likely to [sic] gain back custodial rights if she is released.

(Emphasis added.)

[¶13.] Mother's third motion for compassionate release did not fully describe her history of using and selling drugs or directly placing the Children in the midst of her illegal activity. It argued that Mother had not, herself, abused the Children—because she was incarcerated—and needed only to obtain early release to reunify her family.

[¶14.] At a review hearing on April 22, 2025, the circuit court addressed Mother's first continuance request. Mother asked the court to continue the proceedings to await the federal district court's decision on her third motion for compassionate release request. Through counsel, Mother argued that the attorneys handling the compassionate release motion were hopeful "she will be released early" but added, "we don't exactly know when that decision from [the federal court] will come down[.]"

[¶15.] The State opposed the continuance and argued that even if Mother were released, she was not in a position to care for the Children. The Children's attorney also opposed the continuance, citing the Children's need for stability and "finality." The circuit court denied the continuance, noting the abuse and neglect proceeding had been pending for nearly fifteen months, the uncertainties in Mother's compassionate release motion, and the Children's need for stability.

[¶16.] Prior to the presentation of evidence at the May 7, 2025 final dispositional hearing, Mother's counsel returned to the subject of a continuance, but she did not actually move for one, at least at that point. Instead, counsel stated, "At the conclusion of this trial, we are going to ask the [c]ourt to grant [Mother] more time. As the [c]ourt knows, and is aware of, [Mother has] a pending compassionate release clemency case . . . and we believe that those circumstances merit a delay in this case." The circuit court proceeded with the presentation of evidence.

[¶17.] The State called a Department caseworker and an Indian Child Welfare Act (ICWA) expert, the latter of whom testified that the State had met the legal standards to justify termination of Mother and Father's parental rights. Mother attended remotely via video conference, but she did not testify.

[¶18.] Mother's attorney did not present a closing argument as such, but, instead, again addressed the topic of a continuance, arguing Mother's "pro bono [compassionate release] team feel strongly that [Mother] will be granted compassionate release based on her family circumstances." Mother's counsel then outlined Mother's positive actions during the pendency of the proceedings, concluding by stating, "We would like [the Department] to possibly explore a

guardianship for both children. And we would like more time to wait a [sic] decision on her compassionate release request for relief." The State and the Children's attorney opposed the continuance request. They argued that Mother's circumstances had not changed since the earlier unsuccessful compassionate release motions and emphasized the Children's need for permanency.

[¶19.] In connection with its oral ruling on the merits, the circuit court denied Mother's continuance request. The court stated it could not "speculate about [M]other's release or whether or not that [compassionate release] motion will be granted," citing our decision in *In re A.S.* *See* 2000 S.D. 94, ¶¶ 22, 25, 614 N.W.2d 383, 387 (per curiam) (affirming circuit court's decision to terminate parental rights after refusing to "speculate" on parent's release from custody and further noting the parent's need for successful transition after release). The court further stated, "We don't know if that continuance would be for three weeks or three months or until [M]other is eventually released without compassionate considerations." After summarizing Mother's history of drug use, the court stated:

> Even if Mother was released today, the children would not be able to be placed with her immediately. She would need to prove her sobriety, be able to locate and maintain housing, be able to provide for the children in a safe and stable home, and, of course, she will remain on supervision for my understanding for an additional ten years, which could always result in her returning to prison if there were violations on her suspended release.

[¶20.] The circuit court ultimately found that the State met its burden under ICWA and that the termination of Mother and Father's parental rights was in the Children's best interests. Mother has appealed the sole issue of whether the court abused its discretion when it denied her continuance requests.

[¶21.] Although not a part of the record, the federal district court apparently granted Mother's request for compassionate release in August 2025, well after the circuit court had terminated Mother's parental rights and after Mother's June 2025 notice of appeal. Mother has appended the district court's decision to her brief and asks us to take judicial notice of it.

[¶22.] The decision is notable in the sense that it examines, among a host of other things, whether Mother's "release is in the best interest of the child" and whether Mother "is an appropriate caregiver." On the topic of abuse and neglect, the federal district court found, "The record shows that there is no evidence of abuse or neglect by [Mother] towards [A.L.]."

[¶23.] Although it appears the federal district court was aware that Mother's parental rights had already been terminated, it stated Mother's rights were "under threat and that compassionate release would grant her the ability to better pursue her appeal to reinstate her parental rights over [A.L.]." The district court noted that "[a]lthough it is not completely clear that [Mother] would be able to take custody of and care for [A.L.] immediately upon release, this is her goal, and she has a time-sensitive opportunity to do so."

### Analysis and Decision

*Judicial notice of the order granting compassionate release*

[¶24.] Under our rules, the appellate record is comprised of "[t]he original pleadings, papers, offered exhibits, and the transcript of the proceedings[.]" SDCL 15-26A-47. We have held, in this regard, that "[a]ppeals are decided entirely on the record received from the trial court. This [C]ourt cannot take new evidence on

appeal, . . . or take judicial notice of facts subject to reasonable dispute." *State v. Rederth*, 376 N.W.2d 579, 580 (S.D. 1985) (citation omitted). Nor can a brief's appendix serve as "a substitute for a party's duty to see that the settled record contains all matters necessary for the disposition of the issues raised on appeal." *Strong v. Gant*, 2014 S.D. 8, ¶ 23, 843 N.W.2d 357, 363 (citation modified).

[¶25.] Judicial notice is a method by which a court may take notice of a fact at any stage in the proceedings. SDCL 19-19-201. We have explained judicial notice in the following way:

> Judicial notice is merely a substitute for the conventional method of taking evidence to establish facts. The doctrine governs judicial notice of an adjudicative fact only, not a legislative fact. Adjudicative facts are those which relate to the immediate parties involved—the who, what, when, where, and why as between the parties. Under South Dakota's rules of evidence, a court may judicially notice an adjudicative fact that is not subject to reasonable dispute because it: (1) Is generally known within the trial court's territorial jurisdiction; or (2) Can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

*Mendenhall v. Swanson*, 2017 S.D. 2, ¶ 9, 889 N.W.2d 416, 419 (citation modified).

[¶26.] As we consider the confluence of these rules here, we perceive several problems with Mother's request to take judicial notice of the federal district court's decision granting her motion for compassionate release. First, the post-termination, post-appeal federal decision is not, of course, part of the appellate record. And, for this reason, judicial notice would not be used as "merely a substitute for the conventional method of taking evidence to establish facts"—it would allow new information into an appellate record that was unknown at the time of the circuit court's decision.

[¶27.] We can, of course, "take judicial notice of relevant decisions of courts and administrative agencies made before or after the decision under review," but they must "have a direct relation to matters at issue." *In re Est. of Flaws*, 2012 S.D. 3, ¶ 22 n.5. 811 N.W.2d 749, 754 n.5 (citation omitted). Here, though, Mother has not established how the federal decision relates to the circuit court's antecedent discretionary decision to deny her motions for a continuance. And, for our part, we cannot perceive a means by which we could logically review the exercise of the court's discretion using facts that had yet to occur or a legal proceeding whose outcome was uncertain.

[¶28.] But, in addition, Mother's request for judicial notice encompasses a flawed premise—i.e., early release from her federal prison term necessarily means she is immediately fit to care for the Children. We think that direct association between release and parental fitness is not supported by the record. Indeed, the circuit court found that even if Mother were released early from custody, it would still deny the continuance request in the exercise of its discretion and the unceasing command to consider the Children's best interests. On this point, the court's findings are eminently supported by undisputed evidence indicating Mother has a lengthy history of using illegal drugs, trafficking in them, and placing her children in close proximity to all of it.[4]

---

4. In the federal district court's compassionate release analysis, it made several abuse-and-neglect-sounding findings about the best interests of A.L. and Mother's suitability as "an appropriate caregiver." The district court also found that "[t]he record shows that there is no evidence of abuse or neglect by [Mother] towards [A.L.]."

(continued . . .)

[¶29.]     Finally, Mother's request transcends what we would ordinarily consider adjudicative facts that simply "relate to the immediate parties involved— the who, what, when, where[,] and why as between the parties." *Mendenhall*, 2017 S.D. 2, ¶ 9, 889 N.W.2d at 419 (alteration in original) (quoting *In re Dorsey & Whitney Tr. Co.*, 2001 S.D. 35, ¶ 19, 623 N.W.2d 468, 474). Not only did the federal district court's compassionate release decision occur after the final dispositional hearing, it also did not involve the parties to this case because the State was not involved in the compassionate release litigation that related to Mother's underlying federal criminal prosecution.[5]

[¶30.]     Under these unique circumstances, we see no real relationship between Mother's request for judicial notice and the current appeal, and we decline to grant Mother's request to take judicial notice.

***The continuance requests***

[¶31.]     "A trial court's decision to grant or deny a continuance is reviewed under an abuse of discretion standard." *People ex rel. L.N.*, 2022 S.D. 8, ¶ 41, 970 N.W.2d 531, 544 (citation omitted). "An abuse occurs when a court fails to justify

---

(. . . continued)
   Incorporating these findings into this appeal through judicial notice carries the potential for confusion as it relates to the relative responsibilities of state and federal courts. Although the findings were significant within the context of the federal compassionate release proceeding, they lack the same resonance within the state court abuse and neglect proceeding where the circuit court alone possessed the authority to determine the Children's best interests and Mother's fitness and ability to parent them.

5.   The federal district court's decision granting Mother's request for compassionate release is easily accessible on a common online legal research platform.

the discretion exercised and such exercise is 'clearly against reason and evidence.'" *Id.* (citation omitted). "The granting or refusing [of] a continuance rests in the sound discretion of the court below, and its ruling will not be reversed, except for the most cogent reasons." *Jessop v. Combs*, 2025 S.D. 71, ¶ 30, 30 N.W.3d 1, 9 (alteration in original) (citation omitted).

[¶32.] When deciding whether to grant a continuance in an abuse and neglect case, courts should consider a child's need for permanency and stability. *See generally L.N.,* 2022 S.D. 8, ¶ 48, 970 N.W.2d at 546 ("Another continuance would have left L.N. in continued uncertainty, contrary to her best interests."). Delays and postponements that lead to continued uncertainty can be contrary to a child's best interests. *Id.*

[¶33.] Here, the circuit court did not abuse its discretion. Mother's scheduled release date was over four years away (January 4, 2030) at the time of the final dispositional hearing.[6] The court acted within its discretion by electing to not speculate about the outcome of Mother's third motion for compassionate release, which was not made any more certain simply because of the stated confidence of her attorneys.

[¶34.] But perhaps more importantly, the circuit court's analysis exposed the faulty premise underlying Mother's request for a continuance which was that her

---

6. In an exhibit to her third compassionate release motion, Mother provided a Federal Bureau of Prisons (BOP) document that indicated her projected release date of January 4, 2030, could be adjusted to August 23, 2026, by applying earned discharge credits Mother had accrued. However, the BOP document also noted that the earlier release date was conditioned on a review of other factors.

early release equaled a quick and successful family reunification. In truth, Mother's release would have effectively set the case back to its beginning by starting the reunification effort anew after fifteen months. In this regard, there is no evidence in the record to suggest that Mother and the Children could simply revert to a point of relative stability. As the Department caseworker noted in her testimony, Mother had been incarcerated for a substantial portion of the Children's lives, and Mother had also directly exposed the Children to drug use and trafficking.

[¶35.]       By finding that "[e]ven if mother was released today, the children would not be able to be placed with her immediately[,]" the circuit court acted consistent with our well-established rule that "[c]hildren are entitled to a stable, healthy environment *now*; they are not required to wait for a parent to acquire parenting skills that may never develop." *L.N.*, 2022 S.D. 8, ¶ 44, 970 N.W.2d at 545 (alteration in original) (quoting *In re Z.Z.*, 494 N.W.2d 608, 610 (S.D. 1992)). In this regard, the court found that the Children had been in limbo for fifteen months, and they needed "stability and permanency" due to their ongoing mental health needs. *See* SDCL 26-8A-26 (requiring circuit courts to "review the child's permanency status and make a dispositional decree every twelve months thereafter as long as the child continues in the custody of the department"). We see no abuse of discretion in this analysis.

[¶36.]       Finally, Mother argues the circuit court's denial of her continuance motions erroneously failed to consider a series of four traditional factors:

> (1) whether the delay resulting from the continuance will be prejudicial to the opposing party; (2) whether the continuance motion was motivated by procrastination, bad planning, dilatory tactics or bad faith on the part of the moving party or his

counsel; (3) the prejudice caused to the moving party by the trial court's refusal to grant the continuance; and (4) whether there have been any prior continuances or delays.

*Anderson v. Streeter*, 2026 S.D. 17, ¶ 18, 33 N.W.3d 51, 56 (citation omitted).

[¶37.] Some of our cases have seemingly described these factors as mandatory, while others have viewed them more as considerations to help guide the court in the exercise of its discretion. *Compare In re Adoption of C.T.E.*, 485 N.W.2d 591, 594 (S.D. 1992) (stating a "trial court must consider" the continuance factors), *and Meadowland Apartments v. Schumacher*, 2012 S.D. 30, ¶ 17, 813 N.W.2d 618, 623 (same), *with VOR, Inc. v. Est. of O'Farrell*, 2025 S.D. 2, ¶ 36, 17 N.W.3d 252, 261 (stating a court "should" consider the listed factors (citation omitted)), *and Anderson*, 2026 S.D. 17, ¶ 18, 33 N.W.3d at 56 ("This Court has established four considerations that *may* guide a circuit court's assessment of a motion for a continuance[.]" (emphasis added)).

[¶38.] We note that Mother's attorney did not cite these factors or reference them in either of her oral motions for a continuance, and there is a question as to whether this specific argument is preserved for our review. But, in any event, resolution of the question presented here—the exercise of the circuit court's discretion—depends less on a formulaic test and more on determining whether the court's decision was within the range of permissible choices. Here, it was. The court "was correctly oriented to the appropriate considerations," *VOR, Inc.*, 2025 S.D. 2, ¶ 36, 17 N.W.3d at 262, which, as indicated above, included the court's consideration of its overarching legal imperative—the best interests of the Children.

## Conclusion

[¶39.]     We decline to judicially notice the federal district court's compassionate release opinion and hold the circuit court did not abuse its discretion when it denied Mother's continuance requests.

[¶40.]     JENSEN, Chief Justice, and DEVANEY, MYREN, and GUSINSKY, Justices, concur.